Marie GEARY, Appellant,

v.

**VISITATION OF THE BLESSED VIRGIN MARY PARISH SCHOOL; Francis J. Clemins, Reverend Monsignor, Individually and as Pastor of Visitation of the Blessed Virgin Mary Church; Archdiocese of Philadelphia.**

No. 93–1062.

United States Court of Appeals, Third Circuit.

Argued July 27, 1993.

Decided Oct. 6, 1993.

Robert J. Reilley, Jr. (argued), Pizonka, Reilley & Bello, King of Prussia, PA, for appellant.

Herbert G. Keene, Jr. (argued), Nicholas Deenis, Stradley, Ronon, Stevens & Young, Philadelphia, PA, for appellees.

Donald R. Livingston, Gen. . Counsel, Gwendolyn Young Reams, Associate Gen. Counsel, Lorraine C. Davis, Asst. Gen. Counsel, Jennifer S. Goldstein (argued), E.E.O.C., Washington, DC, for amicus curiae EEOC.

Steven S. Zaleznick, Cathy Ventrell–Monsees, Sally P. Dunaway, American Ass'n of Retired Persons, Washington, DC, for amicus curiae AARP.

Before: MANSMANN, GREENBERG and LEWIS, Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

We must determine whether the Age Discrimination in Employment Act applies to protect a lay teacher in a church-operated elementary school. The district court concluded broadly that it does not. We disagree and conclude that it may. We caution, however, that when a religious employer contends that a religious tenet or practice—not illegal discrimination—motivated a challenged employment action, the ADEA will apply only so long as the plaintiff does not challenge the validity of the doctrine or practice and asks no more than whether the proffered religious reason actually motivated the employment action.

Here the plaintiff argues that the proffered religious reason did not actually motivate her termination. We will affirm the judgment against her in part because in her opposition to summary judgment, she did not raise any issue of fact to suggest that her

employer had other than a religious motive. Nonetheless, she did raise a genuine issue of material fact as to whether her employer retaliated against her (by canceling her insurance) in violation of the ADEA (a separate count of her complaint). Thus we will vacate the judgment with respect to the retaliation claim and remand for further proceedings.

## I.

For purposes of the motion for summary judgment in the district court, the historical facts were straightforward and were not in dispute. The appellee, Visitation of the Blessed Virgin Mary Parish School, dismissed Marie Geary after she turned 50 and after her twenty-ninth year as a lay teacher there. Geary had previously received favorable reviews and asserts that she would have been Visitation School's highest paid lay teacher. In her stead, Visitation School hired a younger, lower-paid teacher.

As the reason for dismissal, Visitation School stated that Geary had violated Church doctrine by marrying a divorced man. Geary does not dispute that she violated Church doctrine, but she claims that this reason is pretext, and she argues that her age and salary motivated the dismissal.

After Geary instituted an EEOC action, Visitation School canceled her health coverage and indicated that the cancellation was "necessitated" by Geary's legal action.[1] The EEOC found that the dismissal did not violate the ADEA but that the retaliatory cancellation did.

Following the EEOC determination, Geary filed a civil action in the United States District Court for the Eastern District of Pennsylvania. She alleged violations of the ADEA, intentional infliction of emotional distress, and wrongful discharge. The district court held broadly that the ADEA does not apply to religious schools. The court also held that Geary's state claims for emotional distress and wrongful discharge were without merit. The court then granted summary judgment in favor of the defendants.[2] Geary appealed.

We have jurisdiction over the final decision of the district court, 28 U.S.C. § 1291, in which federal subject matter jurisdiction was premised on a federal question and on supplemental claims. 28 U.S.C. §§ 1331, 1367.

We exercise plenary review of the district court's grant of summary judgment, and we apply the same test the district court should have applied initially. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

## II.

█ The ADEA prohibits age discrimination and makes it unlawful to retaliate against an employee who litigates an age discrimination claim. *See* 29 U.S.C. § 623(a), (d).

We determine whether the First Amendment prohibits application of the ADEA to a religious school by following the inquiry set forth in *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). In *Catholic Bishop*, Catholic high schools challenged the National Labor Relations Board's exercise of jurisdiction over lay faculty members of religious schools. In addressing that challenge, the Court invoked the interpretive rule "that an Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available." 440 U.S. at

---

1. The letter canceling coverage reads in part:
   Considering the present legal suit initiated by yourself against the Church and after consultation with Archdiocesan officials, it is no longer deemed appropriate to continue carrying you on Visitation's health coverage plan. .... It is our understanding that all medical coverage will terminate on December 31, 1991.
   This action is necessitated by the legal course you are pursuing in regard to your termination as an employee of Visitation School.
   Brief In Opposition To Defendants' Motion For Summary Judgment, Exh. B.

2. In addition to Visitation School, Geary named as defendants the Archdiocese of Philadelphia, and Francis J. Clemins, Reverend Monsignor, individually and as Pastor of Visitation of the Blessed Virgin Mary Church.

500, 99 S.Ct. at 1318. To implement the rule, the Court first "ma[d]e a narrow inquiry whether the exercise of the Board's jurisdiction presents a *significant risk* that the First Amendment [would] be infringed." *Id.* at 502, 99 S.Ct. at 1319 (emphasis added).

Upon making that inquiry, the Court determined that two aspects of the Board's exercise of jurisdiction would create a significant risk of excessive government entanglement in religion.[3] First, the Court referred to a situation in which a religious school, charged with an unfair labor practice, responds with an assertion that religion mandates the challenged action:

> The resolution of such charges by the Board, in many instances, will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission. It is not only the conclusions that may be reached by the Board which may impinge in rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions.

440 U.S. at 502, 99 S.Ct. at 1320.

Second, the Court noted that religion pervades parochial schools, and that nearly everything that occurs in the schools is arguably a "condition of employment." Therefore, the Board's function in determining the "conditions of employment" would present a significant risk of government-religion entanglement. 440 U.S. at 502–04, 99 S.Ct. at 1319–20.

Having determined that the exercise of jurisdiction posed a significant risk of violating the First Amendment, the Court considered whether Congress intended the Board to have jurisdiction over teachers in church-related schools. The Court observed that "there is no clear expression of an affirmative intention of Congress that teachers in

church-operated schools should be covered by the Act." 440 U.S. at 504, 99 S.Ct. at 1320. After further examining the statute, the Court "decline[d] to construe the Act in a manner that could in turn call upon the Court to resolve difficult and sensitive questions arising out of the guarantees of the First Amendment Religion Clauses." *Id.* at 507, 99 S.Ct. at 1322. Because the Court did not interpret the Act to grant the Board jurisdiction over parochial schools, the Court never addressed whether such jurisdiction would pass constitutional muster.

In sum, in *Catholic Bishop* the Court employed a three-part inquiry. First, a threshold question: would application of the statute present a significant risk of infringing the First Amendment? Second, the interpretive rule: is there a permissible construction of the statute that avoids that risk, or alternatively, is there a clear expression that Congress intended that the statute apply? And, third: if the statute applies, does it violate the Religion Clauses of the First Amendment?

Since *Catholic Bishop*, the Court has indicated that religious institutions are subject to some regulation. *See Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 628, 106 S.Ct. 2718, 2723, 91 L.Ed.2d 512 (1986) ("even religious schools cannot claim to be virtually free from some state regulation"); *see also Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), (the Religion Clauses alone do not bar application of a neutral, generally applicable criminal law to religiously motivated action) ("*Smith II*"). Our task is to determine, by following the inquiry set forth in *Catholic Bishop*, whether the ADEA may be applied to Visitation School. *See, e.g., Little v. Wuerl,* 929 F.2d 944 (3d Cir. 1991) (applying *Catholic Bishop* to Title VII case); *DeMarco v. Holy Cross High School,*

---

**3.** The Court focused on the "entanglement" prong of the three-prong *Lemon* test. *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (regulation of, or aid to, religious institution is valid if its primary purpose is secular, its primary effect neither advances nor inhibits religion, and if it does not create excessive government entanglement with religion).

Although the *Lemon* test has been criticized, *see Lamb's Chapel v. Center Moriches Union Free School District,* —— U.S. ——, ——, 113 S.Ct. 2141, 2148, 124 L.Ed.2d 352 (1993) (Scalia, J., concurring), the test remains valid. *See id.* at —— n. 7, 113 S.Ct. at 2148 n. 7 (per White, J.).

4 F.3d 166, 169 (2d Cir.1993) (applying *Catholic Bishop* to ADEA case). *See also Employment Division v. Smith "Smith I"*, 485 U.S. 660, 672–73, 108 S.Ct. 1444, 1451, 99 L.Ed.2d 753 (1988) (refusing to assume that Oregon's neutral drug law applied to religious uses and remanding for determination by Oregon Supreme Court).

## III.

### A.

Applying the first prong of the *Catholic Bishop* inquiry to the facts here, we conclude that application of the ADEA to the lay faculty of a religious school does not present a significant risk of entanglement. Figuring prominently in our conclusion is the distinction between, on the one hand, the Board's pervasive jurisdiction in *Catholic Bishop* and, on the other hand, the simple prohibitions of the ADEA. In *Catholic Bishop*, the Court observed that the Board's function in supervising "conditions of employment" would inject the Board into "nearly everything" that occurs in a religious school, including, of course, religious practices. Here, the ADEA's inquiry is only whether Visitation School discriminated against Geary on the basis of age, and further, whether Visitation School canceled Geary's insurance in retaliation for her suit. The Court of Appeals for the Second Circuit recently drew this same distinction in an ADEA suit brought by a lay employee against a Catholic School. *See DeMarco*, 4 F.3d 166, 169–70 (recognizing distinction between "ongoing supervision" and "limited inquiry"); *id.* at 170 (sole question in ADEA case is whether plaintiff was unjustifiably treated differently because of age).

The Court of Appeals for the Ninth Circuit has also drawn this distinction between pervasive supervision and simple prohibition. In *EEOC v. Pacific Press Pub. Assoc.*, 676 F.2d 1272, 1282 (9th Cir.1982), which applied Title VII's prohibitions of sex discrimination to protect a secretary at a religious publisher, the court observed:

> The potential for ongoing entanglement or continuous supervision of church affairs by the government's regulations is the critical entanglement issue which deserves the most emphasis.

*Pacific Press*, 676 F.2d at 1282. *See also EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir.1980) (holding that Title VII's prohibition of racial discrimination protected a faculty member at a religious college); *Ritter v. Mount Saint Mary's College*, 814 F.2d 986 n. 1 (4th Cir.1987) (ADEA action does not present a significant risk of infringing First Amendment).

Apart from the distinction between ongoing supervision and limited inquiry, another consideration prompts our conclusion that application of the ADEA will not create a significant risk of entanglement. There is an absence here of any direct conflict between the ADEA's secular prohibition and the proffered religious doctrine. Visitation School does not suggest that the Catholic religion mandates age discrimination, nor does Geary suggest that the ADEA prohibits Visitation School's right to implement Catholic teachings on marriage. Although such a direct conflict has led to our application of *Catholic Bishop*'s interpretive rule, *see Little*, 929 F.2d at 951, we do not here imply that a direct conflict would render a neutral law of general applicability inapplicable to a religious institution. *See Smith II*, 494 U.S. at 872, 110 S.Ct. at 1596. We note only that because there is no direct conflict here, we do not have occasion to invoke the interpretive rule of *Catholic Bishop* or the precepts of *Smith II*.

This case thus differs from *Little v. Wuerl*, 929 F.2d at 944, in which Susan Little, like Geary, lost her teaching job at a Catholic school after she had entered into a canonically invalid marriage. Unlike Geary, Little claimed that her employer had violated Title VII's prohibition of *religious* discrimination. Employing the three-part *Catholic Bishop* inquiry, we found, first, that subjecting the employer to a claim of religious discrimination would raise substantial questions under the Religion Clauses. *Little*, 929 F.2d at 947–49. We noted that

> if this court were to review the Parish's decision, it would be forced to determine what constitutes "the official teachings, doctrine or laws of the Roman Catholic

Church" and whether plaintiff has "rejected" them.

Id. at 948. We further noted that:

> In this case, the inquiry into the employer's religious mission is not only likely, but inevitable, because the [employer's] specific claim is that the employees' beliefs or practices make her unfit to advance that mission. It is difficult to imagine an area of the employment relationship *less* fit for scrutiny by secular courts. Even if the employer ultimately prevails, the process of review itself might be excessive entanglement.

*Id.* at 949 (emphasis in original).

Having determined that application of Title VII would raise constitutional concerns, we further determined that "neither Title VII's plain language, nor its legislative history, demonstrates Congress' affirmative intent that Title VII apply here." 929 F.2d at 951. We held, therefore, that Little did not have a Title VII claim against the Parish. *Id.*

Unlike Little's claim, Geary's claims do not inevitably or even necessarily lead to government inquiry into Visitation School's religious mission or doctrines. Geary's retaliation claim illustrates this point well. Because Visitation School does not claim that its religious practices require the cancellation of her insurance employment benefits in response to her claims, and because Visitation School does not claim that the cancellation was motivated by some non-retaliatory religious reason, the prosecution of that claim will not lead to any inquiry regarding Church doctrine.

**B.**

We are mindful that some age discrimination cases will touch upon First Amendment concerns. First, a religious institution may argue that religion mandates age discrimination. Second, a religious institution may argue that a permissible religion-based discrimination formed the true motive for the action challenged by the plaintiff. We reiterate that Geary's case does not present the first type of argument, and we need not invoke *Catholic Bishop* or *Smith II* on that basis.

■ Here, we face the second type of argument, typical in a "pretext" case, in which an employer argues that its action flowed from a permissible motive (here, religion) rather than from the alleged, unlawful motive (age).[4] So long as Geary does not challenge the validity of the religious doctrine (and she does not), this second argument does not raise entanglement concerns sufficient to invoke the interpretive rule of *Catholic Bishop.* At most, Geary asks the court to determine whether the religious reason stated by Visitation School actually motivated the dismissal.

For example, before the EEOC, Geary tried to show pretext by arguing that Visitation School had not fired a similarly remarried teacher. The hearing officer found:

> Charging Party [Geary] compared herself to another teacher, who married in a civil ceremony, but continues to be employed with the [School]. First, the record shows that her comparator, who is ten years older than the Charging Party, remarried her former husband. Since neither party re

---

4. Typically, once an employee makes a prima facie showing of age discrimination, the employer must articulate a legitimate reason for its action. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981); *Massarsky v. General Motors Corp.,* 706 F.2d 111, 117 (3d Cir.) (applying *McDonnell Douglas* to ADEA case), *cert. denied,* 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). The employee then has the burden of showing that the legitimate reason offered by the employer is pretext, *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093, although showing pretext

alone may not be sufficient to prove discrimination, as the Supreme Court recently held in the Title VII context. *See St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). In *St. Mary's,* the district court found for the employer even though the district court did not believe the employer's proffered reason for firing the plaintiff. The Supreme Court held that such a result was possible because the employee retains the burden of showing by a preponderance of the evidence that a discharge was illegally motivated. Showing pretext is not necessarily sufficient to meet the plaintiff's burden of proof.

married, the church does not recognize this couple as having been divorced. R. at 37.

As the hearing officer's findings indicate, this avenue for showing pretext only required the hearing officer to apply uncontested Church doctrines regarding marriage to conclude that Visitation School's justification was in fact the reason for the termination. Had Visitation School been unable to explain the allegedly disparate treatment of Geary and of her "comparator," the officer might have rendered, without entanglement, a different conclusion regarding the school's motive for termination.

A conclusion that the religious reason did not in fact motivate dismissal would not implicate entanglement since that conclusion implies nothing about the validity of the religious doctrine or practice and, further, implies very little even about the good faith with which the doctrine was advanced to explain the dismissal. *See Hicks,* —— U.S. at ——, 113 S.Ct. at 2783 (to say that the company which in good faith introduces testimony of intent becomes a liar when the testimony is not believed is nothing short of absurd).

Assuming arguendo that a determination of pretext implies, no matter in how attenuated a form, a rejection of a religious organization's "good faith" in proffering a reason for its action, the determination would not run afoul of the entanglement concerns in *Catholic Bishop. Catholic Bishop* concerned a legislative scheme in which a government body could, sua sponte, challenge *any* religious doctrine or practice and then directly inquire into the good faith of the religious reason for it. In an ADEA case, the inquiry is far more limited and any determination of pretext would implicate good faith only indirectly in the context of litigation.

Finally, although *Catholic Bishop* expressed concern with the "process of inquiry" into the Church doctrine, *see id.* 440 U.S. at 502 n. 10, & 507–08, 99 S.Ct. at 1320 n. 10, & 1322 (appendix involving murky inquiry into the definition of a Catholic liturgy), we do not envision any such inquiry in a pretext case such as this. The secular tribunal merely asks whether a sincerely held religious belief

actually motivated the institution's actions. The institution, at most, is called upon to explain the application of its own doctrines. Such an explanation is no more onerous than is the initial burden of any institution in any First Amendment litigation to advance and explain a sincerely held religious belief as the basis of a defense or claim. Indeed, because the court in an ADEA case should not examine either the validity or the religious nature of the doctrine, the burden of the religious institution to explain is considerably lighter than in a non-religious employer case. *Compare Africa v. Commonwealth,* 662 F.2d 1025 (3d Cir.1981) (determining that a prisoner's beliefs, although sincere, were not "religious").

■ Thus, when the pretext inquiry neither traverses questions of the validity of religious beliefs nor forces a court to choose between parties' competing religious visions, that inquiry does not present a significant risk of entanglement. However, the First Amendment dictates that a plaintiff may not challenge the validity, existence or "plausibility" of a proffered religious doctrine, and we caution that the ADEA would not apply in such a case. *Accord DeMarco,* 4 F.3d 166, 171.

Indeed, when the employee who challenges an employment decision is a member of the clergy, some courts have refused to allow even this limited inquiry into pretext. For example, in *Scharon v. St. Luke's Episcopal Presbyterian Hosp.,* 929 F.2d 360, 363 (8th Cir.1991), the employee, the Reverend Anne Scharon, was an ordained Episcopal priest. She argued that excessive entanglement could be avoided because the defendants' claims that religious issues had been the basis for her termination were merely pretext for the actual motive. Therefore, she asserted, government involvement with religion could be avoided by focusing solely on the issues of age and sex discrimination. *Id.* at 363. The Court of Appeals for the Eighth Circuit held otherwise:

> [A]s the Supreme Court said in *Catholic Bishop,* 440 U.S. at 502, 99 S.Ct. at 1320, "[t]he resolution of such charges ... will necessarily involve inquiry into the good

faith of the position asserted by the clergy-administrators.... It is not only the conclusions that may be reached ... which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry." *See also Minker v. Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354, 1354, 1356–57 (D.C.Cir.1990) (In rejecting a minister's ADEA claim, the court noted that the "determination of 'whose voice speaks for the church' is *per se* a religious matter.... We cannot imagine an inquiry less suited to a temporal court.") ....

*Scharon,* 929 F.2d at 363.

The court in *Scharon* drew an express distinction between cases in which clergy were involved and cases in which employees did not have duties of a religious nature. *See id.,* 929 F.2d at 363 n. 3 (observing that courts subject personnel decisions of religious organizations to scrutiny where duties of employees are not religious and citing *inter alia Pacific Press,* 676 F.2d at 1272, and *Mississippi College,* 626 F.2d at 477). The court expressed

> confidence that courts will continue to consider these situations on a case-by-case basis, looking in each case to see whether the plaintiff's employment discrimination claim can be adjudicated without entangling the court in matters of religion.

*Scharon,* 929 F.2d at 363 n. 3. *See also DeMarco,* 4 F.3d 166, 171–72.

Regarding Geary's religious duties, Visitation School explained that "[t]he unique and important role of the elementary school teacher in the Catholic education system mandates [a] commitment to the philosophy and principles of the Catholic Church." Appellees' Brief at 3, n. 2. We believe, however, that notwithstanding Geary's apparent general employment obligation to be a visible witness to the Catholic Church's philosophy and principles, a court could adjudicate Geary's claims without the entanglement that would follow were employment of clergy or religious leaders involved. *Compare DeMarco,* 4 F.3d at 172 (distinguishing case in which employer/employee relation is so pervasively religious that no pretext inquiry can be made without offending First Amend-

ment, and case in which references to employee's religious inadequacy are limited to very specific, testable allegations).

## C.

█ Because application of the ADEA does not present a significant risk of government entanglement in religion, the interpretive rule of *Catholic Bishop* does not apply and we need not seek evidence of an "affirmative intention of Congress" that the ADEA apply to lay teachers at religious institutions. Even if such evidence were necessary, the structure of the ADEA suggests that Congress intended a general application. The ADEA's substantive provisions were derived *in haec verba* from Title VII. *EEOC v. Zippo Mfg. Co.,* 713 F.2d 32, 38 (3d Cir.1983) (quoting *Lorillard v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978)). Therefore, since religious institutions are not exempt from Title VII's prohibitions of discrimination on the basis of race, color, sex and national origin, *see, e.g., EEOC v. Fremont Christian School,* 781 F.2d 1362 (9th Cir.1986) (sex discrimination); *Rayburn v. General Conference of Seventh–Day Adventists,* 772 F.2d 1164, 1166 (4th Cir.1985), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986); *Pacific Press,* 676 F.2d at 1277; *Mississippi College,* 626 F.2d at 477, neither are they exempt from the ADEA's prohibition of age discrimination. *Accord, DeMarco,* 4 F.3d at 173 (because Title VII applies to religious institutions and ADEA is modeled on Title VII, Congress intended ADEA to apply to religious institutions).

## IV.

█ Although Geary could bring a claim against Visitation School under the ADEA, she was required under *McDonnell Douglas* to refute Visitation School's proffer of a legitimate reason for her dismissal. *See, e.g., Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093. Any challenge to the validity or "plausibility" of the religious reason would of course do damage to the protection afforded Visitation School by the First Amendment, *see, e.g., DeMarco,* but Geary might have

demonstrated, for example, that similarly remarried persons had not been fired, that she did not in fact marry, or that Visitation School's explanation did not emerge until late in the litigation. Geary, however, did not make any such demonstration in opposition to Visitation School's motion for summary judgment. Indeed, Geary did not contest that she in fact violated the very doctrine that Visitation School claimed as the reason for her dismissal, and she did not present any evidence that would suggest a non-religious basis for her dismissal.

We have thus determined that, with respect to Geary's age discrimination claim and with respect to her state claims, Geary failed to comply with Rule 56(e). Geary failed to include any affidavits or other competent documents to set forth facts showing that there was a genuine issue of fact as to the reason for her discharge. She merely alleges in the Brief In Opposition that she "believes that her age was the determinative factor," that she was one of the highest paid teachers, that she was fifty years old at the time, and that she was replaced by a younger, less experienced and lower paid teacher.

Moreover, although discovery had not yet taken place, Geary failed to include an affidavit under Rule 56(f) to indicate why she could not present facts essential to justify her opposition. *See* FRCP 56(f); *see also Celotex Corp. v. Cartrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (premature motions for summary judgment can be adequately dealt with under Rule 56(f)).

Thus, we will affirm the district court's entry of summary judgment on the discrimination claim and state claims in favor of the defendants.

### V.

■ With respect to Geary's retaliation claim, which Visitation School concedes does not present any First Amendment issues, we note that Geary attached Visitation School's letter canceling her health coverage to her Brief In Opposition. The letter expressly links the cancellation of health benefits to the ADEA action.[5] Thus it adequately raises an issue of fact for trial on Geary's retaliation claim.

### VI.

For the foregoing reasons, we will vacate in part the judgment of the district court, and we will remand the case for further proceedings on Geary's retaliation claim. On all other claims we will affirm the judgment entered in favor of defendants.

---

5. *See supra* n. 1. The letter canceled the health insurance, "considering the present legal suit initiated by yourself against the church," and stated that the cancellation was "necessitated by the legal course you are pursuing."